UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

RICHARD PATTIASINA,

                                        Plaintiff,

v.                                                                            Case # 12-CV-6170-FPG

                                                                              DECISION AND ORDER

TIMOTHY SEWALT, BRIAN S. GILMORE,
JOHN DOE, Correction Officers; KRISTA L. PUTNEY,
RITA A. GUSH, MICHELE H. POTRZEBOWSKI,
DONNA M. KELSEY, Nurses; and MARK L. BRADT,
Superintendent at the Elmira Correctional Facility,

                                        Defendants.

_____


## INTRODUCTION

Plaintiff Richard Pattiasina ("Pattiasina") brings this civil rights action under 42 U.S.C. §

1983 against several Defendants, all of whom were employed by the New York State

Department of Corrections and Community Supervision ("DOCCS") at the Elmira Correctional

Facility in 2009. The action centers around Pattiasina's allegation that on June 19, 2009, he was

kicked in the groin by Corrections Officer Timothy Sewalt ("CO Sewalt"), and that he suffered a

fractured testicle from this incident. Pattiasina further alleges that Corrections Officer Brian

Gilmore ("CO Gilmore") was present when CO Sewalt kicked Pattiasina, and that CO Gilmore

failed to intervene to prevent the use of force. Pattiasina also alleges that after he was injured by

CO Sewalt, that Nurses Krista Putney, Rita Gush, Michele Potrzebowski and Donna Kelsey were

deliberately indifferent to his serious medical needs in failing to provide him with adequate

medical care in the seven days following the incident. Finally, Pattiasina alleges that Mark

Bradt, who was the Superintendent of the Elmira Correctional Facility, was deliberately

indifferent to the risk of assaults by correctional officers against inmates, and that this

indifference contributed to the injuries Pattiasina sustained as a result of the June 19, 2009 incident.

CO Gilmore, Nurses Putney, Gush, and Potrzebowski, and Superintendent Bradt have all moved for summary judgment[1]. ECF No. 34. After receiving Pattiasina's Response (ECF Nos. 36, 37, 38, 39) and the Defendants' Reply (ECF No. 42), the Court heard oral argument from the parties. After argument, the parties filed supplemental briefs (ECF Nos. 45, 47).

At oral argument, the parties agreed to dismiss CO John Doe and Nurse Donna Kelsey from this action. Based upon that agreement, the claims against CO John Doe and Nurse Donna Kelsey are hereby dismissed.

For the following reasons, the Defendant's Motion for Summary Judgment is DENIED with respect to Nurses Putney, Gush, and Potrzebowski, and is GRANTED with respect to CO Gilmore and Superintendent Bradt.

## DISCUSSION

I.   Summary Judgment Standard

The standard for ruling on a summary judgment motion is well known. A party is entitled to summary judgment "if the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted).

When considering a motion for summary judgment, all genuinely disputed facts must be resolved in favor of the non-moving party. *Scott v. Harris*, 550 U.S. 372, 380 (2007). In order

---

[1]     A summary judgment motion was not filed on behalf of CO Sewalt.

2

to establish a material issue of fact, the non-movant need only provide "sufficient evidence supporting the claimed factual dispute" such that a "jury or judge [is required] to resolve the parties' differing versions of the truth at trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968)). Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments). If, after considering the evidence in the light most favorable to the non-moving party, the Court finds that no rational jury could find in favor of that party, a grant of summary judgment is appropriate. *Scott*, 550 U.S. at 380 (citing *Matsushita*, 475 U.S. at 586-587).

II.    Failure to Intervene

CO Gimore argues that he is entitled to summary judgment because he did not have a reasonable opportunity to intervene in the alleged attack on Pattiasina by CO Sewalt. I agree.

In Pattiasina's deposition[2], he testified that CO Sewalt, CO Gilmore and another officer took him out into the prison hallway, where CO Sewalt conducted an aggressive pat frisk of him. Pattiasina testified that during that pat frisk, CO Sewalt kicked Pattiasina's feet apart, and told him that "I better listen to what he's saying, he's the boss of the mess hall." During the pat frisk, CO Sewalt's kicking of Pattiasina's feet caused Pattiasina to come off of the prison wall, and CO Sewalt then took Pattiasina to the ground. Once on the ground, CO Sewalt kicked Pattiasina in the groin, "like a soccer kick." Pattiasina further testified that it was only a "split second" after he was taken to the ground that he was kicked in the groin by CO Sewalt. CO Gimore and the

---

[2]    As the non-moving party, the facts are viewed in the light most favorable to Pattiasina.

other officer were approximately five to seven feet behind CO Sewalt when the kick occurred. The kick only occurred once, after which the use of force ended, and the other officers left.

Officers can be held liable under § 1983 for failure to intervene in a situation where excessive force is being used if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Ricciuti v. New York City Transit Auth.,* 124 F.3d 123, 129 (2d Cir. 1997). Whether an officer had sufficient time to intercede is ordinarily an issue for the jury to resolve "unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir. 1994).

Here, no reasonable jury could find that Gilmore had a reasonable opportunity to intervene. Pattiasina himself testified that only "a split second" elapsed between the time CO Sewalt took him to the ground and kicked him in the groin, and this undisputed point is fatal to Pattiasina's failure to protect claim against CO Gilmore.

In arguing otherwise, Pattiasina suggests that CO Sewalt's attack did not occur without warning, and that CO Gilmore therefore could have intervened. Pattiasina argues that "Sewalt's kick was preceded by his angry and very public verbal tirade, an improper and aggressive pat frisk, kicks to the legs, and a two-handed push to the ground, all of which was witnessed by Gilmore." ECF No. 36, at 7. There are at least two problems with this argument.

First, this recitation overstates the facts. Pattiasina testified that Sewalt was "talking gibberish," and telling him that he was the boss, and that he'd better listen to what he says. This is far from an "angry and very public verbal tirade," but even if this were all true, it is still not sufficient to suggest that a violent attack was about to occur. Also, Pattiasina argues that because "[CO] Sewalt admitted that a kick to the legs itself constitutes excessive force, a reasonable jury

4

could find that [CO] Gilmore should have interceded at least by that point in time, before the injurious kick to the groin." ECF No. 36, at 13-14. Pattiasina's counsel cites to this admission by CO Sewalt to support their position, but what CO Sewalt thinks amounts to excessive force as a matter of law is not determinative, and is simply not relevant. Indeed, it is well settled that "not every malevolent touch by a prison guard gives rise to a federal cause of action." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quotation omitted). As the Supreme Court has held, "an inmate who complains of a push or shove that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Wilkins,* 559 U.S. at 38. With these standards in mind, the simple act of a prison guard pushing an inmate to the ground could almost never constitute excessive force, and again, even if it did in this case, the kick occurred immediately after CO Sewalt took Pattiasina to the ground, making it impossible for CO Gilmore to intervene.

Second, even accepting the argument that the pat frisk was conducted aggressively or inappropriately, it is far too great of a leap to suggest that because a pat frisk was conducted contrary to established protocol, that an officer must know that a violent attack is on the horizon. Similarly, Pattiasina's argument that CO Gilmore was somehow involved in "setting up" CO Sewalt to be able to harm Pattiasina has no evidentiary basis in the record. In short, CO Sewalt's actions did nothing to show that a violent attack was about to occur such that CO Gilmore would have an opportunity to intervene, and there is no evidence in the record upon which a rational jury could find in favor of Pattiasina. As such, CO Gilmore's Motion for Summary Judgment is GRANTED, and he is dismissed from this case.

III.    Deliberate Indifference

Nurses Putney, Gush and Potrzebowski argue that they are entitled to summary judgment, because the record evidence cannot support Pattiasina's claim for medical indifference as a matter of law. I disagree.

In order to establish a violation of the Eighth Amendment arising out of inadequate medical treatment, Plaintiff must prove that Defendants acted with "deliberate indifference to [his] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The "deliberate indifference" standard has both objective and subjective components. *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). To satisfy the objective component, the alleged medical need must be "sufficiently serious." *Id.* A "sufficiently serious" medical need is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Id.* "Factors that have been considered include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).

To satisfy the subjective prong, a plaintiff must show that a defendant acted with a "sufficiently culpable state of mind" in depriving him of adequate medical treatment. *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). "The subjective element of deliberate indifference entails something more than mere negligence . . .[but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.*; *see also Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (likening the necessary state of mind to "the equivalent of criminal recklessness"). In order to be found "sufficiently culpable," the official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; [ ] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

"The totality of an inmate's medical care must be considered in order to determine whether a prison official has acted with deliberate indifference to serious medical needs."

*Wandell v. Koenigsmann*, No. 99 CIV 8652 WHP, 2000 WL 1036030, at *3 (S.D.N.Y. July 27, 2000). In addition, "prison medical staff is given wide discretion in determining how to treat inmates." *Williams v. Smith*, No. 02 Civ. 4558 DLC, 2009 WL 2431948, at *9 (S.D.N.Y. Aug. 10, 2009). Thus, a "mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance*, 143 F.3d at 703. Nevertheless, "[i]n certain instances, a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Id.*

Nurses Putney, Gush, and Potrzebowski do not dispute that Pattiasina's condition meets the objective component of the deliberate indifference test, and I agree that Pattiasina's injury would be considered objectively serious, as the Second Circuit defines a serious injury as "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702.

The only question that remains is whether a reasonable jury could find that Nurses Putney, Gush, and Potrzebowski evinced the necessary subjective element in their actions (or inactions) towards Pattiasina's condition. In arguing that a jury could so find, Pattiasina argues that "each of the nurse defendants was the 'gatekeeper' for Mr. Pattiasina's access to medical care, and, despite the seriousness of his injury, none of them opened the gate so that Mr. Pattiasina could be properly examined and treated to relieve his severe pain and repair his injured testicle." ECF No. 36, at 16.

The first contact Pattiasina had with any of the Nurse Defendants after the incident in question occurred with Nurse Putney on the late evening and/or early morning of June 19 and 20, 2009. Pattiasina requested an emergency sick call, and told Nurse Putney that he was "kicked in

the balls" by an officer.  When Nurse Putney saw Pattiasina, she was the only medical provider on duty.  In her deposition, she stated that she had the option of seeing Pattiasina herself, of seeking the on-duty physician, or seeking the DOCCS medical consultant who was available 24 hours a day, 7 days a week by video conferencing.

Despite this, Nurse Putney did not avail herself of these resources, and despite her acknowledgement that a groin injury is particularly painful, she only visually inspected Pattiasina's genital area and never conducted a physical exam of his testicles.  Both the Plaintiff's and the Defendants' medical experts both opine that the failure to palpate Pattiasina's scrotum was inconsistent with good and accepted medical care.

Nurse Gush did not see Pattiasina until June 22, 2009, and her examination appears to be more perfunctory than that of Nurse Putney's.  Nurse Gush testified that during her examination, she didn't visually inspect Pattiasina's genitals, nor did she perform a physical exam.  Instead, she wrote "right testicle swollen and tender" in her medical notes, but those notes were based solely on what Pattiasina told her.  During Nurse Gush's deposition, she testified as follows:

> Q:   When you saw Richard Pattiasina on June 22nd and he told you that he had been kicked in the groin on the previous Friday and that his testicle was swollen and tender and that his groin area was tender, you knew right away you were not going to examine him; am I right?
> A    Yes.
> Q    You knew right away you weren't going to even visually examine him?
> A    Correct.
> Q    You knew right away that all you were going to do was write in the chart and send him on his way?
> A    Yes.

Nurse Gush gave Pattiasina Motrin to take every 4 to 6 hours, and wrote "MD#1" in his chart, which she testified was an indication that Pattiasina should receive a doctor's appointment within 24 to 48 hours.  There is no evidence in the record that Gush ever followed up on her notation to have Pattiasina seen by a doctor within 24 to 48 hours, and indeed, Pattiasina had not

been seen by a doctor three days later, when he again requested sick call.  Although Nurse Gush also testified that she was capable of making sure that an inmate could get immediate attention if it was medically warranted, she did not provide such immediate attention to Pattiasina.

Nurse Potrzebowski saw Pattiasina on June 23, 2009, where he reiterated what happened to him, and the pain he was experiencing.  Potrzebowski knew that Pattiasina hadn't seen a doctor in the five days since the injury occurred, and she admitted that she believed that Pattiasina had a serious injury and that a fractured testicle was likely to cause substantial pain. Although she admitted that she could arrange for an immediate examination in certain circumstances, she also did not do so.  Instead, she made another entry in his chart – the same MD#1 entry as the day before – to have him seen by a doctor within 24 to 48 hours.

Finally, Nurse Kelsey – who has now been dismissed as a Defendant in this case – saw Pattiasina on the evening of June 25, 2009, and arranged for him to see a nurse practitioner on an expedited basis.  That nurse practitioner saw Pattiasina on June 26, 2013 and sent him to the emergency room at Arnot Ogden Hospital, where Pattiasina underwent surgery to repair a right testicular fracture.  Kelsey testified that she "pushed to get him in right away" to see a doctor because she "thought someone dropped the ball with him."

On this record, there are material issues of fact that prevent summary judgment being granted in favor of Nurses Putney, Gush, and Potrzebowski.  The existence of the culpable state of mind required to support a finding of deliberate indifference is a "question[ ] of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Gabriel v. Cnty. of Herkimer,* 889 F. Supp. 2d 374, 398 (N.D.N.Y. 2012) (quotation omitted).  As the Second Circuit recently held, "deliberate indifference is a mental state equivalent to subjective recklessness . . . this mental state requires that the charged official act *or fail to act* while actually aware of a substantial risk that serious inmate harm will result." *Nielsen v. Rabin*, 746 F.3d 58,

63 (2d Cir. 2014) (emphasis added). Officials need only be aware of the risk of harm, not actually intend harm. *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006). And awareness may be proven "from the very fact that the risk was obvious." *Farmer,* 511 U.S. at 842. As a result, the Motion for Summary Judgment on behalf of Nurses Putney, Gush, and Potrzebowski is DENIED.

IV.     Superintendent Bradt

Superintendent Bradt moves for summary judgment on the basis that there is no evidence to demonstrate his personal involvement in the alleged incidents. To counter, Pattiasina points to information reported in a Correctional Association of New York (CANY) report that allegedly shows a high incidence of abusive conduct by officers at the Elmira Correctional Facility on the 3-11 P.M. shift, and argues that Superintendent Bradt was aware of this report.

It is well settled that a supervisory defendant may not be held liable on a theory of *respondeat superior*. Instead, to be held liable for a Constitutional violation committed by a subordinate, the supervisor must have (1) participated directly in the alleged constitutional violation; (2) after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) created a policy or custom under which the unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

Putting aside the issue of whether or not the CANY report is admissible, even if it is, it does not create a triable issue of fact that would permit a rational jury to impose liability on Superintendent Bradt for an act of his subordinates. The CANY report does not provide specific information regarding the other Defendants in this case, or regarding this incident, or any other

basis upon which liability could be imposed on a supervisor.  Indeed, the report does not single

out any officers, single out a particular location in the prison where multiple attacks previously

occurred, or anything along those lines that would provide a specific basis for a supervisory

official to respond.  Rather, the report informs a reader generally that, based upon interviews

with inmates and others, that officers working the evening shift have a reputation for being

"cowboys."  Of course, that term of art is open to several interpretations, and in this case, it is far

too general.  Simply put, it cannot sustain the Plaintiff's burden of proof in this case to provide a

basis upon which to find the Superintendent should be liable for the acts of his subordinates.

Pattiasina also argues that he was unable to secure any video recordings of the incident at

Elmira despite the fact that he requested it, and he argues that inmates are not given access to

video from the facility when that video could be helpful to them.  When Bradt was asked about

this topic during his deposition, he testified that:

> Q:  So at Elmira were you aware of any inmates that ever had
> access to a video for the purpose of use at a disciplinary
> hearing?
> A:  No.
> Q:  It works the other way though if an officer accuses an
> inmate of wrongdoing and the officer believes that the
> incident was taped on video, that videotape is immediately
> secured for the use against the inmate; am I right?
> A:  I'm not aware that it's immediately secured, no.
> Q:  But it is secured?
> A:  Chances are probably.

This testimony also fails to establish any basis to hold the Superintendent liable for the

alleged acts of his subordinates in this case.  First, it is not specific to the actions taken by the

Superintendent in this case, nor does it establish any policy or custom that allowed any potential

violation to occur.  At best, these general questions establish that the Superintendent was

unaware of inmates being provided with video of alleged incidents, which stops far short of

adducing facts upon which a rational jury could conclude that the facility, under the direction of

the Superintendent, had a policy of keeping video from inmates, and that through that policy, Pattiasina suffered injuries as a result.

For these reasons, a reasonable jury could not find liability on the part of the Superintendent for either the alleged acts of CO Sewalt or for Nurses Putney, Gush, and Potrzebowski, and the claims against him are dismissed with prejudice.

## CONCLUSION

For all of the foregoing reasons, the Defendants' Motion for Summary Judgment (ECF No. 34) is GRANTED IN PART AND DENIED IN PART.  Specifically, the Motion is granted with respect to CO Gilmore and Superintendent Bradt, the claims against them are dismissed with prejudice, and they are dismissed from this case.  The Motion is denied with respect to Nurses Putney, Gush and Potrzebowski.  Further, based upon the parties' agreement, Defendants CO John Doe and Nurse Donna Kelsey are also dismissed from this action.

IT IS SO ORDERED.

DATED:          September 28, 2015
                      Rochester, New York

HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court